# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH EDELSTEIN, | ) | CASE NO. 1:18-CV-00077 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| | ) | |
| Defendant. | ) | |

In 2009, Plaintiff Joseph Edelstein, a dedicated and competent attorney for the Social Security Administration (SSA) since 1986, applied for the position of Administrative Law Judge (ALJ). Edelstein contends that the SSA failed to promote him based on his religion and his age, in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act of 1976 (ADEA), 29 U.S.C. § 633a, *et seq*.

This case is before the Court on cross-motions for summary judgment: Plaintiff's Motion for Summary Judgment (Plaintiff's Motion), **Doc #: 28**, and Defendant's Motion for Summary Judgment (Defendant's Motion), **Doc #: 27**. The Court has reviewed the Motions, Plaintiff's Opposition Brief, Doc #: 29, and Defendant's Opposition Brief, Doc #: 31. Although the record shows Edelstein was more than qualified to be an ALJ, it is the Court's conclusion, as will be shown below, that he has failed to show the decision not to promote him was unlawfully based on his religion or his age.

1

**I. FACTS**

Plaintiff Joseph Edelstein is an Orthodox Jew who is 66 years old today.[1] At the time Edelstein applied for the position of ALJ, he was 56 years old and had been an SSA attorney for 23 years, a Senior Attorney for the SSA for 14 years, and a magistrate judge. Def. Mot. at 3. The record shows that he generally completed approximately 300 decisions per year, and that he was a reliable employee who mentored new attorneys (including one who was appointed to an ALJ position over Edelstein) and some new ALJs. Pl. Mot. at 9, 10, 11. In support of his application, attorneys, colleagues, and current ALJs wrote highly of Edelstein. For example, ALJ Thomas Ciccolini, Edelstein's Hearing Office Chief ALJ, wrote that he was extremely qualified for the position, "is thoroughly[,] ethically[,] and technically proficient in all respects," and could be counted on to fulfill the duties required of an ALJ. *Id.* at 2, 3. Others urged that the SSA "could not get a better person" and that in his current position, Edelstein serves as the "go to person for difficult cases." *Id.* at 9, 10.

In 2009, based on his years of experience, Edelstein applied to be an ALJ and was subsequently placed on the register of qualified candidates. Pl. Mot. at 1. Candidates on this register are listed in numerical order, based on the location of the vacancy and the applicant's geographic preferences. (Edelstein requested consideration for ALJ positions in Akron and Cleveland, Ohio). *Id.* Eligible candidates are then interviewed by a two-member panel of ALJs and assessed according to fourteen "important competencies that effective ALJs generally bring to the job." Def. Mot. at 2, 3. A different two-member panel of ALJs then reviews the candidate's application folder, which includes his/her resume, references, background investigation summary, and interview rating, and assigns the candidate a review rating of

---

[1] The transcript of an August 1, 2013 EEOC hearing indicates that Edelstein was born in October of 1952. Pl. Mot. (Exhibit 11).

"Highly Recommend," "Recommend," or "Not Recommend." *Id.* at 3. The panel, when appropriate, also provides additional guidance for its rating, such as "low" or "borderline" recommend. *Id.* To complete this process, the agency's appointing official selects the new ALJ from amongst the highest three eligible candidates that are available for appointment. *Id.* In doing so, the appointing official is "not required to consider an eligible who has been considered by him for three separate appointments from the same or different certificates for the same position." *Id.*; 5 C.F.R. § 332.405.

In June 2010, ALJs David Hatfield and Lisa Dabreu conducted Edelstein's interview. Def. Mot. at 4. They asked Edelstein a series of questions and recorded their observations to his responses. *Id.* They wrote that Edelstein made "very little eye contact" and "closed [his] eyes during most of the interview." *Id.* They noted that his answers were "vague and shallow," and that when asked why he wanted to be an ALJ, Edelstein "repeatedly indicated that he needed the money" and that he was interested in the position because it was a "lifetime position." *Id.*

Edelstein readily admits that his interview went poorly. Def. Mot. at 4. He testified that the interview "for some reason just from the get-go didn't go well," and that "the more [he] spoke the worse it got." *Id.* Nonetheless, Edelstein asserts that he never used the word "money" during his interview. Pl. Mot. at 6. Instead, he used the word "income" twice when discussing the security of the position, its benefits, and the fact that it would allow him to support his wife and five children. *Id.* Edelstein contends that the ALJs' interpretation of his responses were reflective of "an ancient and vile stereotype" and derogatory of his Judaism. *Id.*

Although Edelstein's prior work as a magistrate was discussed at the interview, ALJ Hatfield noted his concern that Edelstein's magistrate work was not reflected in his resume. Pl. Mot. at 5. The record shows, however, that at the interview, both ALJs had Edelstein's complete

3

resume, which included his previous magistrate experience. *Id.* at 7. Regardless, the ALJs wrote "Not Recommend" for seven of the fourteen competencies and "Recommend" for the other seven. Def. Mot. at 4. They then submitted their interview ratings to the Office of the Chief ALJ. *Id.*

Pursuant to the application process, ALJs Clarence Moore and Katherine Thomas comprised the two-member panel that reviewed Edelstein's 2010 application folder. Def. Mot. at 5. Upon review, they gave Edelstein a rating of "Borderline Recommend" based on his "good supervisory recommendations" but "very poor interview." *Id.*; *see supra* at 2. In 2011, after Edelstein submitted additional favorable references,[2] ALJs Moore and Thomas reviewed Edelstein's folder again, but did not change his "Borderline Recommend" rating due to his "very poor interview." *Id.* Notably, Edelstein asserts that this two-member panel did not discriminate against him. *Id.* at 13.

In 2011, Regional Chief ALJ Jasper Bede considered Edelstein's application for an ALJ position in Akron. *Id.* This was the third ALJ position that Edelstein was considered for after he was not selected in 2010 for two other vacancies in Akron. *Id.* Upon review, ALJ Bede selected Stewart Goldstein for the position. *Id.* Goldstein is older than Edelstein and also Jewish, but not an Orthodox Jew. Pl. Mot. at 5.

During his interview, Goldstein, a member of the National Treasury Employees Union (NTEU), stated that he "could not do 500-700 decisions [per] year," that he delegates work to others, and that he "is not an expert at anything except getting re-elected." Pl. Mot. at 8. Following his initial folder review, Goldstein was given a rating of "poor." *Id.* Both Edelstein and Goldstein had poor interviews, but the differences between both applicants with respect to

---

[2] Edelstein received additional references from a number of ALJs, including one from a Chief ALJ, as well as references from his past and current hearing office directors. Pl. Mot. at 9, 10.

4

their previous employment, work product, and recommendations are noteworthy. *Id.* at 9, 10, 11. At the time they submitted their applications, Goldstein was a Union Officer, while Edelstein was a Senior Attorney for the SSA and a former magistrate judge. *Id.* at 10. In comparing their work product, from 2007 to 2011, Goldstein wrote a total of 201 decisions, while Edelstein wrote 1,141 decisions. *Id.* at 11. And Edelstein received a number of recommendations from both ALJs and attorneys, each encouraging his selection and detailing his qualifications for the position, while Goldstein's recommendations only pertained to his work as a Union Officer. *Id.* at 9, 10.

Prior to selecting Goldstein for the Akron ALJ vacancy, ALJ Bede was Goldstein's Regional Chief ALJ. Pl. Mot. at 12. As such, he was asked to comment on whether Goldstein was qualified to become an ALJ. *Id.* On May 9, 2008, ALJ Bede opined that Goldstein "has consistently demonstrated that he cannot function well in a position which requires the management of a large docket, efficient evaluation of complex facts, and timely decision making." *Id.* On April 9, 2009, ALJ Bede stated that he could not identify any of Goldstein's strengths as an employee and questioned whether he is "technically proficient." *Id.* at 12, 13. On July 17, 2010, however, ALJ Bede wrote of Goldstein "I am not familiar with this applicant and cannot provide a reference." *Id.* at 13. Pursuant to ALJ Bede's last comment, Goldstein filed a reprisal grievance through his union against the SSA, and the two parties came to a settlement agreement. *Id.* Nine months later, on April 27, 2011, after a *fourth* folder review by ALJs Moore and Thomas, the same ALJs who reviewed Edelstein's folder, increased Goldstein's rating to "Recommend." *Id.* Goldstein was subsequently hired for the Akron ALJ position, allowing him to join fellow NTEU members and ALJs James Hill and Barbara Sheehe. *Id.* at 13.

After Edelstein was not selected for the Akron ALJ vacancy, ALJ Bede declined to consider his application for two Cleveland vacancies because he had already been considered for three separate ALJ appointments. Def. Mot. at 6. Instead, ALJ Bede selected Charles Shinn, whom Edelstein had previously mentored, and William Mackowiak, who was older than Edelstein, for the Cleveland positions. Pl. Mot. at 4.

Edelstein subsequently filed a complaint with the EEOC, alleging age and religious discrimination with regard to the SSA's hiring of Goldstein, Shinn, and Mackowiak. Def. Mot. at 6. After exhausting his administrative remedies, the EEOC sent Edelstein a right-to-sue letter, authorizing him to file suit under Title VII and the ADEA in federal district court. Doc #: 9-1 (EEOC Letter). Edelstein did so on January 11, 2018. Def. Mot. at 6.

**II.     LEGAL STANDARD**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.@ Fed. R. Civ. P. 56 (a). If a reasonable jury could return a verdict for the nonmoving party, however, summary judgment for the moving party is inappropriate. *Baynes v. Cleland*, 799 F.3d 600, 606 (6th Cir. 2015). The moving party bears the initial burden of demonstrating that there are no material facts in dispute, and the evidence submitted must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1962). To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A fact is deemed material only if it might affect the outcome of the case under the governing substantive law. 799 F.3d at 606 (citing *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994), in turn citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986)).

Here, the parties have filed cross-motions for summary judgment. In reviewing cross-motions for summary judgment, courts are to "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. U.S.*, 20 F.3d 222, 224 (6th Cir. 1994). "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *John v. State of La. (Bd. Of Trustees for State Colleges and Universities)*, 757 F.2d 698, 705 (5th Cir. 1985)). Further, the standards upon which courts evaluate motions for summary judgement "do not change simply because the parties present cross-motions." *Id.* (citing *Home for Crippled Children v. Prudential Ins. Co.*, 590 F.Supp. 1490, 1495 (W.D. Pa. 1984)).

**III.     ANALYSIS**

    **A.     Edelstein abandoned his age discrimination claim.**

The Supreme Court of the United States has long recognized that the burden is on an employment-discrimination plaintiff to establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1972); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). In order to establish a *prima facie* case of age discrimination, "a plaintiff must show: (1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Blizzard v. Marion Technical College*, 698 F.3d 275, 283 (6th Cir. 2012) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)). Berryhill argues that the Court need not consider Edelstein's age discrimination claim because he failed to address it in his Opposition Brief to Defendant's Motion. Def. Op. Br. at 1. The Court agrees.

"This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011)) Here, Edelstein did not make a single reference to the age discrimination claim in his Opposition Brief to Defendant's Motion. Accordingly, the Court finds that Edelstein has abandoned his age discrimination claim. Thus, only Edelstein's religious discrimination claim is left for the Court to address.

### B. Edelstein has failed to establish a *prima facie* case of religious discrimination.

To establish a *prima facie* case of religious discrimination under Title VII, the plaintiff must show that he (1) was a member of a protected class, (2) was denied a promotion, (3) was qualified for the position, and (4) was passed over in favor of someone outside of the protected class. *See Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009) (applying the U.S. Supreme Court's *McDonnell Douglas* test) (citing *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008)); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). "If the plaintiff is able to present a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007) (citing *McDonnell Douglas*, 411 U.S. at 802)). Then, "if the defendant meets this burden, the burden then shifts back to the plaintiff who must show that the defendant's proffered reason is a pretext for discrimination." *Id.* at 515-16.

Contrary to Berryhill's argument, the Court finds that Edelstein has adequately shown that he was a member of a protected class (Jewish), was denied a promotion, and was qualified for the position. Contrary to Edelstein's position, the Court finds that he has failed to show that

8

he was passed over in favor of someone outside the protected class, the fourth prong of the *prima facie* case.[3]

Edelstein asserts that Goldstein, although also Jewish, is dissimilar from him because Goldstein does not practice the Orthodox Jewish faith. Def. Mot. at 5. However, Edelstein has failed to provide any evidence of Goldstein's religion or religious practices apart from his bare assertion that Goldstein "is Jewish, but not Orthodox Jewish." *Id.* Edelstein did not bother to depose Goldstein and failed to submit an affidavit from Goldstein showing his religious affiliation or practices. More importantly, Edelstein failed to show that ALJ Bede, the selecting ALJ, had any knowledge of Goldstein's religious affiliation or practices. Edelstein Dep. at 8, 70-71.

Edelstein contends that ALJs Hatfield and Dabreu, who interviewed him at the beginning of the application process, discriminated against him based on his religion because of their repeated references to money – reflecting an ancient and derogatory stereotype of Jews and anti-Semitism. The problem with this argument is twofold. First, it is Edelstein who raised the subject of income when asked why he was interested the ALJ position, stating that he had a wife and five children to support and could use the additional income. Thus, he cannot blame the ALJs for mentioning it in their evaluation. Second, the derogatory stereotype of Jews as overly materialistic is a generalized stereotype that applies to all Jews, not just Orthodox Jews. In any event, Edelstein admits that his interview was terrible, and the interview was not the sole basis for ALJ Bede's hiring decision and neither ALJ Hatfield nor ALJ Dabreu was the selecting official.

---

[3] Edelstein does not argue that Shinn and Mackowiak were chosen over him based on religion.

Even if Edelstein could establish a *prima facie* case of discrimination, he bears the ultimate burden of persuading the Court that the defendant intentionally discriminated against him. *Storrs v. University of Cincinnati*, 271 F.Supp.3d 910, 927-28 (S.D. Ohio 2017) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). He may accomplish this by introducing direct evidence showing that in treating him adversely, ALJ Bede was motivated by discriminatory intent, or by introducing circumstantial evidence that supports an inference of discrimination. *Id.* (citing *Logan v. Denny's Inc.*, 259 F.3d 558, 566-67 (6th Cir. 2001).

Here, Edelstein is his own worst witness. He argues that the real reason ALJ Bede selected Goldstein over him was not based on his religion, but in response to the union reprisal grievance Goldstein filed against the SSA when ALJ Bede rejected Goldstein's third application for the Akron ALJ position. Pl. Opp'n at 5. According to Edelstein, the SSA had already appointed two other union officers to ALJ positions in Akron and sought to emasculate the union by making its officers ALJs.

> The [SSA], especially for Commissioner Glen Sklar, saw the grievance as a way of beheading the Union. Mr., James Hill, president of the NTEU, was hired as an ALJ. Barbara Sheehe, treasurer of the NTEU, was hired as an ALJ. The hiring of Goldstein would be a trifecta and essentially bust the union. Goldstein was hired. All three union officers, Hill. Sheehe and Goldstein, ended up in the same office (Akron). This does not appear coincidental. The top officers of the unions were now ALJs. The union has become a shadow of its former self.

*Id*. As if to punctuate the lack of discriminatory animus based on Edelstein's religion or age, he states, "Goldstein is older than I. He is Jewish, but <u>not</u> Orthodox Jewish. However, none of these factors is relevant. <u>Goldstein was going to be hired no matter what his faith and no matter what his age.</u>" Pl. Opp'n at 4 (emphases in original). Because Edelstein admits that neither age nor religion was relevant to the decision to hire Goldstein, he has failed to meet his ultimate burden of showing that the decision not to hire him was motivated by his religion or his age.

10

### III. CONCLUSION

Although Edelstein was certainly qualified to be elevated to the position of ALJ, he cannot show that the decision not to promote him was based on his religion or age. Accordingly, Defendant's Motion, **Doc #: 27**, is **GRANTED**, and Plaintiff's Motion, **Doc #: 28**, is **DENIED**. All claims against Berryhill are hereby **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

    */s/ Dan A. Polster    December 3, 2018*
**Dan Aaron Polster**
**United States District Judge**